IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MATTHEW DILL, TIMOTHY LORITO, YAHINA VARGAS, and RICHARDSON GAP, LLC

    Plaintiffs,

vs.

VICTOR CANALES and VCAA, LLC,

    Defendants.

Case No.: 6:20-CV-00653-MC

OPINION AND ORDER

MCSHANE, J.:

Plaintiffs Matthew Dill, Timothy Lorito, Yahina Vargas, and their company Richardson Gap, LLC, bring this action against their business partner Defendant Victor Canales, and his company, VCAA, LLC. Canales ("Defendant" throughout this opinion) moves for judgment on the pleadings on Plaintiff's fraud claim.[1] For the reasons stated below, the motion is granted.

**BACKGROUND**

Plaintiffs are in the hemp cultivation and processing business and operate that business from a farm in Oregon (the "Property"). Sometime in March 2019, Defendant offered to invest in Plaintiffs' business through his corporation VCAA, LLC. The parties began discussing the

---

[1] Plaintiffs bring the Fraud claim against Canales only. Plaintiffs claims for declaratory relief and to quiet title, and Defendants' own counterclaims, are not at issue in the pending motion.

1 – OPINION AND ORDER

details of this transaction. In May, they agreed that VCAA would eventually own 50% of Plaintiffs' operation, and they formed Five Point Ranch, LLC (the "Business"), to be the "primary entity operating . . . on the Property." Am. Compl. ¶ 21, ECF No. 9. In June, Defendant paid Plaintiffs one million dollars as an "initial payment." Am. Compl. ¶ 23. During these discussions, Defendant "represented to [Plaintiffs] that he had access to at least $20 million in working capital and could therefore fund a large-scale expansion of operations at the Property." Am. Compl. ¶ 25.

Over the course of Summer 2019, VCAA paid $3.1 million to expand the Business, and the parties continued discussing the terms of the ownership agreement. On August 5, 2019, with no contract signed, Defendant told Plaintiffs that "money was no issue." Am. Compl. ¶ 28. Discussions regarding the ownership terms continued into fall.

At the same time, the hemp market experienced a downturn, and the Business was not making enough sales to cover its costs. Am. Compl. ¶ 30. By the end of 2019, the hemp market "collapsed 80%." Pls.' Resp. to Def. Mot. for J. on Pleadings 1, ECF No. 21.

At some point in Fall 2019, the parties reached a tentative agreement regarding the Business. "[The parties] agreed that Defendant[] would pay Plaintiffs $2.3 million directly for a 50% ownership stake in [the Business] (the "Buy-In Payment"). Plaintiffs agreed that $1 million had already been paid to Plaintiffs[,] and Defendant agreed that an additional $1.3 million payment was required to complete the Buy-In Payment." Am. Compl. ¶ 35. The contract was never signed or performed.

Later, in November 2019, Defendant represented to Plaintiffs that he would contribute $100,000 "to fund ongoing business operations," Am. Compl. ¶ 45, specifically "to purchase ethanol and cover payroll [to] allow [the Business] to fulfill signed contracts," Pls.' Opp'n 17.

2 – OPINION AND ORDER

The money was transferred to the Business account on December 9, 2019, and Defendant transferred a significant portion of the funds to "other entities" on December 10. *Id.* On December 28, 2019, Plaintiffs entered a new contract in reliance on that $100,000. *Id.*

Defendant made no more monetary contributions to the Business, and the ownership agreement fell apart. Defendant told the Plaintiffs on January 23, 2020, that he would no longer fund the Business, Pls.' Resp. 14, and Plaintiffs realized that the $20 million "either no longer existed, had never existed . . ., or [Defendant] chose to invest it elsewhere," Am. Compl. ¶ 47.

Plaintiffs brought this action alleging fraud, and Defendant moved for judgment on the pleadings. Def. Mot. for J. on Pleadings, ECF No. 20. Plaintiffs set forth additional facts in their Response, so the Court will also consider those facts to determine whether Plaintiffs are able to state a claim. Additionally, On March 3, 2021, Plaintiff moved for leave to file a Second Amended Complaint (SAC). ECF No. 37. The Court GRANTS that motion and considers those new allegations when considering Defendant's pending motion.

**STANDARDS**

To survive a motion for judgment on the pleadings, a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

"Judgment on the pleadings is properly granted when there is no issue of material fact, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (quoting *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979).

3 – OPINION AND ORDER

The court must accept the complaint's factual allegations as true and construe those facts in the light most favorable to the non-movant, *id.*, but the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. Once the complaint is stripped of conclusory statements, the judge then applies "judicial experience and common sense" and considers "obvious alternative explanations" to determine if the complaint states a plausible cause of action. *Iqbal*, 556 U.S. at 679, 682 (quoting *Twombly*, 550 U.S. at 567) (internal quotation marks omitted). If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

In addition to the general pleading requirements, a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened standard requires a party to allege "the time, place and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). The party must identify "'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso, U.S. ex rel. v. General Dynamics c4 Systems, Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.2010)) (internal quotation marks and citations omitted). The purpose of Rule 9 is three-fold:

> (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints 'as a pretext for the discovery of unknown wrongs';
>
> (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and
>
> (3) to 'prohibit [] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.

*Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

## DISCUSSION

To determine the elements of a fraud claim, federal courts turn to state law. *Id*. In Oregon, a party alleging a claim for fraud must allege the existence of nine elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

*Bank of N.Y. Mellon v. Stabenow*, 2017 WL 1538156, No. 3:16-cv-01590-MO, at *8 (D. Or Apr. 25, 2017) (citations omitted).

Plaintiffs' various allegations of fraud fail to establish with sufficient particularity the following elements: that Defendant made a representation, that it was false, that Defendant intended to defraud Plaintiffs, and that Plaintiffs had a right to rely. Additionally, Plaintiffs' allegations are implausible on their face.

1. *Plaintiffs fail to allege each element of fraud with particularity*.

Plaintiffs' claim turns on three alleged misrepresentations: 1) Defendant had "access to $20 million in capital" to fund an expansion of Plaintiffs' business; 2) Defendant later stated that "money is no issue;" and 3) that he would provide $100,000 in funding for continued company operations.

First, the Court turns to the representations and their falsity. A representation that a person will do something in the future cannot sustain a fraud claim, unless *at the time the promise was made*, the person had no intention of performing. *Conzelmann v. Nw. Poultry & Dairy Products Co.*, 190 Or. 332, 351 (1950). "[S]uch an intent formed later and carried into effect is insufficient." *Id.* Thus, "[a] plaintiff must set forth what is false about a statement, and

5 – OPINION AND ORDER

why it was false when it was made." *Webster v. Brookdale Senior Living Cmtys., Inc.*, 3:16-cv-01060-AA, 2018 WL 1508871, at *3 (D. Or. March 27, 2018). Finally, "[i]t is, of course, fundamental that a representation claimed to be fraudulent must be as to a material fact, and mere expressions of opinion are ordinarily not actionable." *Hansen v. Holmberg*, 176 Or. 173, 179 (1945).

According to the First Amended Complaint ("FAC"), Plaintiffs claim that three statements from the Defendant were fraudulent misrepresentations. First, Defendant assured Plaintiffs that he had "access to $20 million" that "could be used to fund an expansion" of Plaintiffs' business. Plaintiffs fail to assert with particularity the "when" and "where" of this representation, stating only that it was made "during discussions" which occurred between March and June 2019. The complaint is silent as to where Defendant made this statement. Further, although Plaintiffs assert that the $20 million never materialized, they do not set forth any evidence that the representation was false at the time it was made.

Second, the statement that "money is no issue" is not a verifiable fact but, rather, the opinion of the Defendant and, therefore, is not actionable. Even if it were, Plaintiffs fail to set forth why the statement was false when it was made. Between the FAC and Response, Plaintiffs provide that Defendant made the statement in an August 5, 2019 email. But as noted, Plaintiffs do not allege any facts to suggest that the statement was not true at the time Defendant made it. In the SAC, Plaintiffs allege that on November 30, 2019, Canales for the first time informed Plaintiffs "that his own funds were actually tied up in other ventures," and that "once they finish up" he would "have more of my funds freed up." SAC ⁋ 44. These new allegations, however, do not demonstrate Defendant knew his statement nearly four months earlier that "money is no issue" was not true at the time. As discussed below, the more plausible explanation is that the

downturn in the hemp industry altered Defendant's willingness to continue funding a business facing bleak prospects.

Finally, Defendant later promised that he would contribute $100,000 to company operations. Although the FAC is short on specifics, Plaintiffs' Response, along with the SAC, remedies some of those missing particulars; the Response alleges that Defendant made this representation on December 11, 2019, in-person, on the Property. Again, Plaintiffs fail to specify how the representation was false; that the money was provided but transferred to "another business entity" could as easily be in service of continuing the business's operations as not. Indeed, in the Proposed Second Amended Complaint, Plaintiffs allege that in January 2020 email, Canales confirmed that he transferred $65,000 of these funds to repay a marijuana dispensary Canales owned whose workers performed work for the Business. Plaintiffs do not allege the workers did not perform the work or that Canales overcharged the Business for the work. Based on all the allegations to date, it appears these funds simply went to pay for legitimate Business expenses. Therefore, none of the alleged misrepresentations are plead with sufficient particularity and all are missing evidence that Defendant knew the representations were false at the time.

Turning to the Defendant's intent, Plaintiffs argue that Defendant's ultimate nonperformance suffices to infer a fraudulent intent. However, intent not to perform at the time the promise is made cannot be inferred solely from nonperformance. *Conzelmann*, 190 Or. at 352. Plaintiff must show "[o]ther circumstances of a substantial character" before the court can infer "wrongful intent." *Id.* Such circumstances should reflect the purpose of defrauding another, which is usually to gain some benefit, usually financial, over that person. *Id.* at 353. "[W]here plaintiff was helped by defendant in the way it purportedly assured him that it would seriously

7 – OPINION AND ORDER

undermines plaintiff's contention that the statements were made in an attempt to defraud him." *Webster*, 2018 WL 1508871 at 4.

Here, the essence of the FAC is that the Defendant promised to invest money in and fund a substantial expansion of Plaintiffs' business and then proceeded to invest money in and fund a substantial expansion of Plaintiffs' business. By Plaintiffs' account, VCAA gave them over $4 million between March and December 2019. In return, VCAA received a one-third share of a company with no discernable revenue flow and the opportunity to pay another million dollars for half ownership of that company and the Property. Overall, the FAC depicts a company that was unable to cover its own expenses without regular infusions of cash from VCAA, and it is not clear how Defendant or VCAA accrued any material benefit. Absent circumstances that reflect the purpose of a fraudulent plan or even any benefit Defendant gained, and with the acknowledgement that the "[P]laintiffs were helped by the [D]efendant in the way [he] purportedly assured [them]," the Court cannot infer fraudulent intent. *Id.*[2]

The next element Plaintiffs must allege is that they had a right to rely. The right to rely "requires proof of the reasonableness of the reliance" and is measured by the "totality of the parties' circumstances and conduct." *Oregon Pub. Emp.s' Ret. Bd. ex rel. Oregon Pub. Emp.s' Ret. Fund v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428 (2004). For instance, when a plaintiff is "equally qualified to judge the merits of a business proposition" as the defendant, he may be held to a higher standard for whether his reliance was reasonable. *Id.* (quoting *Coy v. Starling*, 53 Or. App. 76, 81-82 (1981) (internal quotation marks omitted)).

---

[2] That Defendant owns the company the Business used to perform work does not change the outcome. The allegations merely allege that the Business paid money for work performed, and that Defendant owned the business that supplied the workers. There is no allegation that the workers did not perform the work or that the Business was not required to pay for that work performed.

8 – OPINION AND ORDER

Here, Plaintiffs seem at least as well qualified to assess the merits of a business proposition as Defendant, considering their experience in the hemp industry. As noted above, an expression of opinion, such as Defendant's statement that "money is not a problem," is not the type of representation that inspires reasonable reliance. *Hansen*, 176 Or. at 179. However, the other representations may be. Regarding Defendant's access to $20 million in capital, Plaintiffs do not elaborate on why they were relying on that sum during the time period in question or by any certain point in the future. By the end of summer 2019, Plaintiffs had requested $2.3 million for fifty percent ownership in the Business. Defendant had already paid $1 million towards ownership and, apart from that payment, had provided another $3.1 million. It seems unreasonable that Plaintiffs, savvy businesspeople themselves, would have relied on Defendant immediately making available the entire sum. To the extent that the Plaintiffs contend that they should have had unfettered access to all of the capital to which the Defendant had access, the Court finds that unreasonable on its face.

As for the representation that Defendant would supply $100,000 for ongoing operations, the Proposed Second Amended Complaint clarifies the alleged reliance in that instance. Plaintiffs asked for that money to buy "ethanol and cover payroll that would allow [the business] to fulfill *signed* contracts . . ." and Defendant supplied the money. Schechter Supp. Decl. Ex. A, ¶¶ 55-56, ECF No. 24-1. (emphasis added). The money was deposited on December 9, and transfers were made on December 10, which is consistent with making purchases and paying bills, as Plaintiffs had asked. Yet, Plaintiffs contend that they were still relying on this money when they entered a *new* contract, twenty days later. Additionally, Plaintiffs specifically allege that Canales "rerouted" $65,000 of that $100,000 "to other entities [Canales] controls" on December 21, 2019 (i.e., nearly three weeks before Plaintiffs entered the new contract). ECF No. 37-2 ¶ 56. In other

words, Plaintiffs allege: Defendant promised to wire $100,000 to the Business; VCAA then wired $100,000 to the Business; Defendant immediately wired $65,000 of that $100,000 from the Business's account to another entity (owned by Defendant) for work performed for the Business; and three weeks later, Plaintiffs relied on that earlier promise when they entered into new contracts to process hemp. It is not reasonable to expect money that was for one purpose to be available for a different purpose.

Additionally, the SAC alleges Plaintiffs relied on the above statement "in making contractual commitments and promises to local hemp farming enterprises on behalf of Five Point, including a signed contract dated December 28, 2019." SAC ¶ 55. But the SAC also clarifies that by December 28, 2019, the negotiations regarding additional payments had progressed to the point where Plaintiffs could not count on additional funding from VCAA. For example, the SAC clarifies that before Plaintiffs entered into this contract, Defendants repeatedly "offered differing and contradictory excuses" for failing to complete the deal and provide additional funding. SAC ¶ 38. In early August 2019, Defendant represented his hope the deal could be completely "by Labor Day weekend." SAC ¶ 39. On September 20, Defendant informed Plaintiffs "You will have funds wired to you before Columbus Day." SAC ¶ 40. "Both dates came and went without any follow-through from Defendants." *Id.* Defendant made further assurances regarding payment one month later and again in early November 2019. SAC ¶ 41. But instead of wiring additional funds, "Canales suddenly began demanding sales of inventory and products to support cash flow, even though the processing operations of the business had largely just started." SAC ¶ 43. In late November 2019, when Plaintiffs pressed VCAA "for answers as to why it had been so difficult to obtain promised funding to support the operations of the business . . . Canales offered two different excuses." SAC ¶ 44. Indeed, on December 23,

2019, Defendant "informed Plaintiffs that they no longer intended to complete the Five Point Deal as originally negotiated." SAC ⁋ 48. Rather than reviving Plaintiffs' fraud claim, the SAC instead clarifies that at least by December 23, 2019, Plaintiffs could no longer rely on promises of further funding. Therefore, because Plaintiffs have not shown reasonableness, they have not properly plead reliance on Defendant's representations.

A complaint must plead each element of fraud to state a claim under Oregon law, and federal law requires that the circumstances constituting the fraud be plead with particularity. As noted, the complaint fails to do so on multiple levels, so Plaintiffs' fraud claim necessarily fails. More importantly, and fatal to Plaintiff's fraud claim, the allegedly fraudulent scheme is implausible.

2. *Plaintiffs' claim is not plausible.*

To be facially plausible, a complaint must plead factual allegations that allow the court to reasonably infer a claim for relief. *Iqbal*, 556 U.S. at 678. Where facts that support the plaintiff's fraud theory also support an innocent possible alternative, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render the plaintiff's allegations plausible." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)). This means that Plaintiffs must show "more than a business deal gone bad for economic and non-fraudulent reasons" by establishing that the defendant had the intent to defraud them. *Id.* at 997. Where no direct evidence of intent is available, "Plaintiffs may establish that intent by showing the existence of a plausible fraudulent scheme," *id.*, and "then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud," *id.* (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir.1984)).

11 – OPINION AND ORDER

As discussed above, Plaintiffs fail to establish that Defendant had the intent to defraud them. The FAC lays out this "scheme": Defendant offers to expand Plaintiffs' business, despite allegedly knowing he does not have the capital to fund such an expansion. Then, Defendant provides Plaintiffs with $4.1 million. Simultaneously, he enters negotiations to pay another million dollars for 50% ownership in Plaintiffs' entire operation, the success of which is dependent on money he knows he does not have. He then strings the Plaintiffs along, knowing he will never provide the money the operation needs, and finally, he backs out of the deal so that the business, which he now has a one third stake in, fails. Missing from this scheme is any discernable benefit to Defendant. It is not plausible that a person would enter into a complicated fraudulent scheme with no purpose other than to lose millions of dollars.

Further, Plaintiffs present innocent alternatives to a fraudulent scheme. They present two legitimate reasons for Defendant to pull out of the deal or reconsider funding their enterprise. First, Plaintiffs admit that the hemp market experienced a downturn between March and December 2019. *See* FAC at ¶ 31 (noting that the expansion came "during a time of great uncertainty in the hemp business."). Second, Plaintiffs admit that the company was not doing enough business to cover its expenses. *See id.* at ¶ 30 ("Given the downturn in the hemp market, however, these sales were not enough to keep up with the expanded costs of the operation.").

Plaintiffs also present legitimate alternative explanations to their claims that Defendant's promise of $20 million and his promise of $100,000 were fraudulent misrepresentations. Regarding the $20 million, Plaintiffs concede the possibilities that "the money no longer existed . . . or [that Defendant] chose to invest it elsewhere," Am. Compl. ¶ 47. Both possibilities are non-fraudulent and do not indicate that the statement was untrue when it was made. Regarding the promise of $100,000 to continue funding operations, Plaintiffs allege that it was not true because,

12 – OPINION AND ORDER

after Defendant supplied the money, Defendant withdrew large sums of it from the business account. However, as noted above, depositing money into a business account and then paying money out of that account is as consistent with paying bills as it is with anything else. As such, Plaintiffs have not shown "more than a business deal gone bad for economic and non-fraudulent reasons." *Eclectic Props.*, 751 F.3d at 997.

In sum, "all of the facts Plaintiffs have presented are consistent with both their theory of liability and [the] innocent alternative[,]" that a downturn in the hemp industry and the Business's failure to cover its costs led Defendant to rethink his investment. *Id.* at 998-99. Therefore, Plaintiffs have not provided the "something more" needed to "render [their] allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* at 999 (quoting *In re Century Aluminum Co.*, 729 F.3d at 1108).

3. *Leave to amend would be futile.*

After a responsive pleading is served, plaintiffs must request leave of court to further amend a complaint. Fed. R. Civ. P. 15. District courts have significant discretion when considering leave to amend, *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1148, 1160 (9th Cir. 1989), but courts usually grant such leave liberally "when justice so requires," Fed. R. Civ. P. 15. However, four main factors—undue prejudice to the defendant, undue delay, plaintiff's bad faith, and futility—limit that liberality. *DCD Programs v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Further, courts may consider "whether plaintiff has previously amended its complaint." *Ascon Properties*, 866 F.2d 1149, 1160 (citing *Leighton*, 833 F.2d at n.3). The factors weigh differently, but the only factor that is by itself insufficient as grounds for dismissal is undue delay, which is not at issue here. *Leighton*, 833 F.2d at 186.

13 – OPINION AND ORDER

Here, Plaintiffs have previously amended their complaint, and they present facts in their Response that they could add to a second amended complaint. The Response, filed after three months of discovery, still does not present more than "the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678. Even with the benefit of some discovery, Plaintiffs fail to allege a plausible fraudulent scheme, to plead particular details of alleged misrepresentations, and to plead each element of fraud required under Oregon law. In fact, the Response presents new facts detrimental to their argument (e.g. that the "downturn" in the hemp market was actually an 80% "collapse[]"). Though the Response offers many legal conclusions and nefarious-sounding phrases, it offers few new facts that support Plaintiffs' claim. Similarly, Plaintiff's proposed SAC merely confirms that the parties' discussion around formation of the Business occurred during a time of great uncertainty in the industry and that, at some point, Defendant decided to stop throwing millions of dollars into a bad business. Despite three chances to establish Defendant acted fraudulently, Plaintiffs merely manage to clarify that during the time period at issue, the expansion came at "a time of great uncertainty in the hemp business, FAC at ¶ 31, and, "[g]iven the downturn in the hemp market," FAC at ¶ 30, Defendant reevaluated his earlier commitment to funnel additional funds into a business where the "sales were not enough to keep up with the expanded costs of the operation," *id.* As the allegedly fraudulent scheme is implausible, the Court dismisses Plaintiffs' fraud claim with prejudice.

/ / /

/ / /

/ / /

/ / /

/ / /

14 – OPINION AND ORDER

## CONCLUSION

Defendant's motion for judgment on the pleadings is GRANTED. Plaintiffs' fraud claim is dismissed with prejudice.

IT IS SO ORDERED.

Dated this 30th day of March, 2021.

                                             _____/s/ Michael McShane_____
                                                              Michael McShane
                                                     United States District Judge